IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 15, 2023

**STATE OF TENNESSEE v. JAMIL TOURE HOLLOWAY**

**Appeal from the Criminal Court for Davidson County**
**No. 2021-C-1118    Jennifer L. Smith, Judge**

_____

**No. M2022-00862-CCA-R3-CD**
_____

A Davidson County jury convicted the Defendant, Jamil Toure Holloway, of first degree premeditated murder, first degree felony murder, attempted first degree murder causing serious bodily injury, and aggravated assault with a deadly weapon.  The trial court imposed a life sentence plus thirty-one years in the Tennessee Department of Correction.  The Defendant appeals, contending that there is insufficient evidence to support his convictions.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Jay Umerley (on appeal), and Nathan D. Cate (at trial), Nashville, Tennessee, for the appellant, Jamil Toure Holloway.

Jonathan Skrmetti, Attorney General and Reporter; Mary Elizabeth King, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Doug Thurman and Kristen E. Stonehill, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a shooting in the parking lot of a Z-Mart gas station in Nashville, Tennessee.  In the parking lot, the Defendant played a "chance game" run out of a trailer parked to the side of the gas station.  After he lost money playing the game, the Defendant and his co-defendant, Mardeus Phillips, returned to the gas station later that night.  The Defendant fired a gun at the security guard, William Foxx, injuring him, and

both defendants fired at the owner of the "chance game," Louis Lisi, killing him. For his role in these offenses, a Davidson County grand jury indicted the Defendant for first degree premeditated murder of Louis Lisi, felony murder of Louis Lisi, attempted first degree premeditated murder of William Foxx, aggravated assault, evading arrest, and theft of property.

At trial, the parties presented the following evidence: Metropolitan Nashville Police Department ("MNPD") officer Andy Esqueda was leaving the MNPD North Precinct on December 21, 2017, when he heard gunfire coming from the Z-Mart gas station ("Z-Mart") located in front of the precinct. He looked in the direction of the gunfire and saw two men firing guns. Due to the proximity of the precinct to the crime scene, there was still gunfire when he arrived in the Z-Mart parking lot. The shooters fled across Clarksville Highway, and Officer Esqueda rendered aid to the victims. Officer Esqueda was unable to see the faces of the men he had seen firing guns as they fled.

MNPD Sergeant Nicholas Kulp responded to a report of a shooting on December 21, 2017, at Z-Mart in Nashville, Tennessee. He arrived at approximately 8:25 p.m., shortly after the shooting occurred. At the scene, Sergeant Kulp attempted to locate surveillance footage from surrounding businesses and the Z-Mart. The Z-Mart had surveillance footage of the shooting, and Sergeant Kulp obtained portions of the footage that night. Sergeant Kulp also confirmed that there was footage from Sunrise Market, a convenience store located next door to the Z-Mart. Surveillance and Investigative Support Unit detectives later obtained the Sunrise Market surveillance footage.

MNPD Detective Jason Moyer worked in the Surveillance and Investigative Support Unit (SISU) and testified as an expert witness in the field of digital video forensics. Detective Moyer obtained video surveillance footage from the Sunrise Market. He explained that the market had five exterior cameras with footage from varying angles. Two of the five cameras captured footage of the individuals involved and/or the shooting. The video retrieval machine for the surveillance video provided time/date information. Detective Moyer determined that the time stamp on the retrieval machine was six hours fast. Detective Moyer also reviewed the surveillance video from the Z-Mart and the time stamp on those recordings appeared to be accurate. Adjusting for the error on the time stamp for the Sunrise Market video, the times shown for surveillance videos from the Sunrise Market and Z-Mart matched.

The State played portions of the surveillance footage for the jury. The first recording from the Sunrise Market showed two men walking across Clarksville Highway toward the Z-Mart and then moving outside the video frame. After a period of time, the men ran across Clarksville Highway away from the Z-Mart. The recording showed one of the men, wearing bright white shoes, fall in the roadway as he fled. The next surveillance

video clip shown to the jury was from a Z-Mart surveillance camera. This recording showed similar footage to that previously shown with two men crossing Clarksville Highway toward the Z-Mart. One of the two men can be seen running up to a black car parked in the Z-Mart parking lot, then followed by a "muzzle flash." Detective Moyer explained that a "muzzle flash" was the light coming out of the barrel of a gun. This "flash" is caused by gasses and leftover gunpowder that exit the gun as the projectile is expelled from the barrel. Detective Moyer noted that some video recordings will catch this "very quick event" while other recordings will not.

The State played the same Z-Mart video recording clip but enlarged. The enlargement focused on the man who approached the black car in the parking lot. Another enlarged video clip more clearly displayed the muzzle flash.

The State played another surveillance video clip that showed two muzzle flashes located near the "second subject," later identified as Co-defendant Phillips, and three muzzle flashes near the "first subject," later identified as the Defendant. Detective Moyer identified a third subject, Mr. Lisi, "on the ground" located near a Suburban vehicle.

The State showed the jury another surveillance video clip recorded from a different angle. The recording showed Mr. Lisi on the ground and police cars entering the parking lot from the North Precinct located directly behind the Z-Mart and Sunrise convenience stores.

William Foxx, a licensed security guard, worked on December 21, 2017, for Louis Lisi. Mr. Lisi operated a "chance game" out of the back of his truck. Successful players could win a prize after playing. On this night, Mr. Lisi parked at the Z-Mart on Clarksville Highway. Mr. Foxx parked his black Dodge Charger directly behind Mr. Lisi's truck and trailer where Mr. Foxx could observe, while seated inside his car, the game "booth" where Mr. Lisi worked. In the trailer, Mr. Lisi kept prize items such as microwaves and stuffed animals. As a licensed security guard, Mr. Foxx was authorized to carry a gun and had a Smith and Wesson .40 caliber automatic pistol.

Between 5:00 and 8:00 p.m., Mr. Foxx observed the Defendant playing the "chance game" six or seven times, which he thought unusual. This provided Mr. Foxx ample opportunity to see the Defendant's face and note his apparel. He recalled that the Defendant wore a dark-colored "top" with torn jeans and dark-colored shoes. He described the Defendant's hair as "spiked" and shorter than how it appeared in court at the time of trial.

At around 8:17 p.m., as Mr. Foxx sat in his car watching Mr. Lisi's trailer, he felt the presence of someone and leaned forward. As he turned his head, he heard a shot and

3

felt "like a sledgehammer hit" the back of his head. Initially, he thought someone had driven into the back of his car but soon realized he had been shot. Mr. Foxx pulled his pistol, opened the car door, and saw black shoes, torn jeans, the dark top, and spiked hair. He was unable to see the person's face, but he recognized the clothing and build from the Defendant who had been playing the game earlier in the evening. Mr. Foxx fired his gun at the Defendant, but the bullet struck his car. He fired again as the Defendant ran up the hill next to where Mr. Foxx was parked. Mr. Foxx then noticed return fire coming from behind a large metal container. He recalled that the gunfire sounded different than the gun the Defendant had fired, and the gunfire was directed at Mr. Lisi. Mr. Foxx believed the sound of the gun was more consistent with a small caliber gun, like a .38.

As the police arrived, Mr. Foxx observed two people running toward Clarksville Highway. Mr. Foxx continued firing his gun and saw one of the men fall. After the shooting, Mr. Foxx observed a bullet hole to the back window of his car. The bullet that caused the hole in the back window had struck the back of Mr. Foxx's head. The other bullet defect to his car was caused by him as he exited his car to return fire at the Defendant. After the shooting had ceased, Mr. Foxx learned that Mr. Lisi had been shot.

The State played video recordings of the shooting, and Mr. Foxx identified himself as the man exiting the black car and firing his gun. He also identified Mr. Lisi and Mr. Lisi's mother-in-law in the video footage. Mr. Foxx testified that had he not moved his head, the bullet would have entered his brain instead of ricocheting off bone as it had. As a result of this incident, Mr. Foxx was diagnosed with post-traumatic stress disorder. At the time of trial, he still experienced anxiety and nightmares. These symptoms contributed to issues in his marriage, and he had also developed "drop foot syndrome," which was being treated with a brace.

On cross-examination, Mr. Foxx testified that he was 99% sure that the Defendant was "the shooter."

Theresa Manning, Mr. Lisi's mother-in-law, would occasionally assist Mr. Lisi with his game trailer at different locations. She explained that the game was a square wooden board that had numbered holes in it. A player rolled balls onto the game board and then the numbers of the holes the balls went into were calculated for a total score. Scores would correlate with different prizes such as housewares, televisions, electronics, or toys. Ms. Manning assisted by passing out free coupons to give gas station patrons an opportunity to play the game.

Ms. Manning was assisting Mr. Lisi on the night of the shooting, and she identified the Defendant in court as one of the people she saw playing Mr. Lisi's game in the Z-Mart parking lot. Ms. Manning did not remember how many times the Defendant played the

4

game but guessed three times. At about 8:15 p.m., Ms. Manning began packing up the game when she heard gunfire. Mr. Lisi jumped off the trailer, and Ms. Manning climbed down behind him. Mr. Lisi went to the passenger side of the vehicle, and Ms. Manning hid behind the Suburban on the driver's side. She saw someone shooting but hid to shield herself from the gunfire. She heard Mr. Lisi make a noise, and she called out for him, but he did not respond. She tried to look through the car window but cut her hand on shattered glass, so she laid back down. Mr. Lisi crawled over to Ms. Manning and told her he had been shot. When she heard someone yell, "run, run," she ran into the store leaving Mr. Lisi behind. When Ms. Manning came back out of the Z-Mart, the police officers would not let her go near Mr. Lisi.

Ms. Manning testified that when she heard the first gunshot, she looked in the direction of the gunfire and saw the shooter. She identified the person who fired the first shot as the Defendant. She confirmed that she was able to see his face. She recalled feeling terrified and believing she was going to be killed. Other than Mr. Foxx, she only saw one other person with a gun and that was the Defendant.

At the hospital that night, Ms. Manning spoke with Detective Frank and told him that she did not see the shooter's face. She explained that, at the time, she was "so shook up and traumatized," but as she later relived the events, she remembered seeing the Defendant after the first shot was fired.

Ms. Manning identified Mr. Lisi's vehicle in photographs. One photograph depicted the vehicle with damage to the front and a flat tire. Ms. Manning said that the tire was not flat nor was there damage to the vehicle prior to these events. She also identified pictures of the game and the trailer. The State showed Ms. Manning the surveillance video footage of earlier in the evening before the shooting. Ms. Manning identified herself in the footage and the Defendant "in the position of playing Mr. Lisi's game." The State played the surveillance footage of the shooting, and Ms. Manning identified the shooter standing near Mr. Foxx's car as the Defendant.

MNPD Officer Warren Fleak was dispatched to the crime scene to create a diagram of the crime scene. The crime scene diagram identified the location of the surveillance cameras and the location of the cartridge casings found at the scene. Police found two different caliber of cartridge casings at the scene, .45 auto and .40 Smith and Wesson, indicating the use of two separate pistols.

MNPD Investigator John Terry, Crime Scene Investigation Unit, collected evidence at the scene after the evidence had been marked and photographed. He collected five .45 caliber cartridge casings, manufacturer Federal. He also collected six .40 caliber casings with a head stamped Star, manufactured by CCI or Steward. Police found two projectile

5

fragments along the right side of the SUV. The police also recovered two projectiles, one located between the trailer and the Suburban, and the other by the ice machine outside the Z-Mart. Police discovered a projectile in the clothing paramedics removed while treating Mr. Lisi at the crime scene.

Investigator Terry also collected a damaged Rossi brand revolver, a .38 special recovered from the middle of Clarksville Highway. Three cartridge casings remained in the cylinder of the revolver and one live round was located approximately fifteen feet further down the road from where the revolver laid. All three of the cartridge casings and the bullet were Federal brand. Investigator Terry explained that a semi-automatic weapon ejects the cartridge casing from the gun as it is fired; however, a revolver does not eject cartridge casings. When all the rounds in the revolver cylinder are fired, the cylinder must be physically opened to remove the cartridges.

MNPD Officer Rhonda Evans testified as an expert witness in firearms and tool mark identification. Officer Evans examined the damaged Rossi revolver. She stated that the firearm was damaged but could still be fired. Officer Evans also examined a projectile the Medical Examiner retrieved from Mr. Lisi's abdomen. Officer Evans test-fired the Rossi revolver and then compared the projectile from the test fire with the projectile recovered from Mr. Lisi's abdomen. Officer Evans found sufficient agreement of individual characteristics between the projectiles to determine that both had been fired from the Rossi revolver.

Mardeus Phillips was charged along with the Defendant in this case and testified as a State witness. Co-defendant Phillips ("Phillips") lived in a house on Meharry Boulevard ("the Meharry house") but was at a friend's house doing laundry when the Defendant called him on the afternoon of December 21, 2017. Phillips was doing laundry in preparation for a trip the following day to Memphis for the holidays. The Defendant asked Phillips to meet him at the Z-Mart gas station on Clarksville Pike. When Phillips arrived, he found Andrew Hamilton with the Defendant. The Defendant was at a "gambling stand" parked behind a Suburban in the parking lot of the Z-Mart. After the Defendant finished playing the game, he walked over to Phillips and told him that he had lost some money and asked if Phillips would drive him to the Defendant's father's house to get more money. Phillips was unaware at the time of how much money the Defendant had lost playing the game but later learned it was about $1,000.

Phillips drove the Defendant, in his silver Chevrolet Impala, to get more money and then they returned to the Z-Mart where the Defendant continued to play the game. After approximately fifteen minutes, the Defendant returned to Phillips's car. Phillips pulled his car into a parking space in front of the Z-Mart, and the Defendant and Mr. Hamilton went inside. After a period of time, Phillips went inside the Z-Mart to see what was taking the

6

Defendant so long, and then all three men exited the store. Mr. Hamilton left with someone else, and the Defendant rode with Phillips to the Meharry house. The Defendant exited the vehicle and Phillips drove to his friend's house to check on his laundry.

A short time later, the Defendant called Phillips and, without explanation, told him to come back to the Meharry house. When Phillips arrived at the Meharry house, the Defendant told Phillips he planned to rob the people to whom he lost his money and that Phillips was going with him. Initially, Phillips declined to join the Defendant, but the Defendant responded, "you don't have any choice." The Defendant had a silver .45 at the time that "concerned" Phillips, so he drove the Defendant to an apartment complex located across the street from the Z-Mart and parked behind the complex.

The defendants exited the car, and the Defendant told Phillips that he planned to shoot the security guard. He gave Phillips a revolver and they walked across Clarksville Highway. The Defendant walked to the back side of a black car and shot the security guard who was sitting inside the car. After the Defendant shot Mr. Foxx, Phillips "just started shooting." Phillips fired at the trailer but was not aiming at anyone specifically. The defendants ran behind "the storage thing" located near the Sunrise Market next to the Z-Mart, where the Defendant continued firing, and Phillips fired one more time. The defendants then ran back across Clarksville Highway. As they did so, Phillips fell and dropped his gun in the street. He got up and ran to his car, leaving the gun behind. He drove the Defendant to the Meharry house, and then drove to his friend's house. Phillips denied that he and the Defendant spoke about the shooting on the return drive to the Meharry house. Phillips stated that the Defendant did not complete the robbery due to the return gunfire from Mr. Foxx.

The following day, Phillips drove to Memphis as planned and remained there until January 24, 2018, when police arrested him. Police officers collected two cell phones from Phillips upon his arrest. Phillips knew the Defendant by his nickname "Milli," and programmed the Defendant's phone number in his cell phone under this nickname. Phillips and the Defendant communicated "periodically" after the shooting until Phillips's arrest in Memphis. He maintained that he and the Defendant never spoke about the shooting. Phillips identified his cell phones (a ZTE and an iPhone) in court.

The State played the surveillance video footage, and Phillips identified himself and the Defendant walking across Clarksville Highway to the Z-Mart and identified the Defendant in the surveillance footage approaching Mr. Foxx's car. In another surveillance footage clip, Phillips identified he and the Defendant running back across Clarksville Highway and confirmed that he was the person who fell while running across Clarksville Highway. Phillips said that he ran away from the shooting because of the return fire and because he heard police sirens.

The State played surveillance video from inside the Z-Mart. Phillips identified himself, the Defendant, and Mr. Hamilton in the recording. The recording showed the men exiting the gas station and walking toward a silver car. Phillips confirmed that the silver car was silver Chevrolet Impala. The State provided Phillips with a still photograph. Phillips testified that the photograph was a picture of him and the Defendant. In the photograph he was wearing the same black and white shoes that he wore at the time of the shooting. The State showed Phillips a photograph of the pistol found on Clarksville Highway, and Phillips confirmed that the pistol was the one he used the night of the shooting.

Phillips testified that his nicknames were "Mardy" and "Debo." He identified the Defendant in court as the shooter.

On cross-examination, Phillips agreed that the gun the Defendant gave him was a .38 revolver and that the bullet found inside Mr. Lisi was a .38 caliber slug, but he maintained that he was not aiming at any person, he only fired the gun because he was scared. Phillips stated that he was testifying because it was "the right thing to do." He acknowledged that he would like the State's consideration for his testimony but that the State's consideration was not the sole reason he chose to testify. Phillips agreed that he was aware of the media surrounding the shooting and that he and the Defendant were suspects. Phillips said that both he and the Defendant covered their faces at the time of the shooting and that he wore a different jacket than what he had worn when at the Z-Mart earlier in the day.

Phillips testified that he and the Defendant left the Z-Mart at around 6:55 p.m., and the shooting occurred at around 8:15 p.m. He described the Defendant as agitated about losing money. He recalled that the Defendant believed that he had been cheated.

Davidson County Medical Examiner David Zimmerman testified as an expert in the field of forensic pathology and testified that he had performed the autopsy on Mr. Lisi. His examination revealed two gunshot wounds, one a non-exiting gunshot wound to the right side of the abdomen and the other to the lower back. Dr. Zimmerman collected the bullet that lodged in muscle tissue of the abdomen and gave it to the police. The wound to the back fractured the sacrum and passed through the right external iliac artery, a fatal wound, and the large intestine. The bullet associated with the back gunshot wound perforated the small intestine twice and perforated the skeletal muscle of the right abdominal wall. Dr. Zimmerman testified that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

MNPD Detective Jason Frank served as lead detective for the investigation of the death of Mr. Lisi and the shooting of Mr. Foxx. When he arrived at the Z-Mart, on the night of December 21, 2017, he spoke with officers at the scene and viewed surveillance footage of the shooting. As they watched the footage, the Z-Mart manager noted that the suspects of the shooting had been inside the Z-Mart earlier that night. The manager located footage of the Defendant inside the Z-Mart prior to the shooting. Detective Frank compared the body build, walking gait, running gait, and clothing between the two sets of surveillance footage.

Detective Frank developed several still photographs of three suspects from the surveillance footage from inside the Z-Mart to be distributed to the local news channels. The photographs distributed that night were of the Defendant, Mr. Hamilton, and Phillips, although Detective Frank did not yet know the names of the suspects at that time. Detective Frank recalled that the suspects' shoes in the surveillance footage were distinct.

On December 29, 2017, after the police apprehended the Defendant, Detective Frank obtained the Defendant's cell phone and submitted it for forensic analysis. After Phillips was arrested on January 24, 2018, Detective Frank secured Phillips's cell phones. The Defendant's cell phone was an iPhone 7, model A-1660. Phillips had two phones, a ZTE phone, model 2831 and an iPhone 5S, model A-1533.

Detective Frank ran a search on the Defendant's driver's license. The Defendant had obtained the license within a couple of months before the shooting. The address listed on the Defendant's driver's license was for a residence on Ashland City Drive in Ashland City, Tennessee. Detective Frank obtained a search warrant for the address on January 8, 2018, and executed the search warrant the following day. During the search, police recovered a Federal .38 Special bullet on the dresser of a bedroom. The bedroom contained male clothing and male personal hygiene products. In the closet of the bedroom, police found a firearm magazine for a .45 automatic Colt pistol.

The State played another clip of surveillance footage from 6:14 p.m. that showed Phillips's car drive up to one of the gas pumps at the Z-Mart. Detective Frank identified the Defendant standing at the game trailer at 6:19 p.m. At 6:21 p.m., Mr. Hamilton and the Defendant walked to Phillips's car and got inside. The next surveillance video footage shown is from inside the Z-Mart. The Defendant had a cell phone in his hand while speaking to a store clerk. The video recording also showed Mr. Hamilton inside the store. As the Defendant spoke with the store clerk, he gestured toward the area where the game trailer was located outside the Z-Mart and "pulled out" a second phone. Detective Frank noted Phillips's distinct shoes, possibly Air Jordan shoes, in the surveillance footage. At 6:36 p.m., the Defendant, Mr. Hamilton, and Phillips exited the Z-Mart and walked to

Phillips's car. The Defendant, Mr. Hamilton, and Phillips got in the car and at 6:52 p.m., Phillips drove away from the Z-Mart.

Detective Frank testified that he believed that the Defendant fired two shots initially, based upon the Defendant's movement in the surveillance video that was consistent with rechambering a round in a firearm. Detective Frank noted the muzzle flash and the upward movement of the firearm indicating the first shot fired. Detective Frank identified the second shot on the recording as a "misfire." The Defendant then appeared to clear the misfire from the weapon. Detective Frank explained that when a shooter attempted to clear a misfire, the person pulled the charger back ejecting the round in the chamber to allow for a new round to enter the chamber. Police found a live .45 round at the Sunrise storage unit, consistent with the Defendant clearing a misfire.

In the surveillance footage, the Defendant and Phillips are in an area between the game trailer in the Z-Mart parking lot and a storage unit in the parking lot of Sunrise Market. Detective Frank noted a muzzle flash near the Defendant's gun. In another surveillance video clip, Detective Frank identified three muzzle flashes from the Defendant's gun. Based upon his investigation, Detective Frank concluded that the Defendant was one of the shooters.

On cross-examination, defense counsel showed a surveillance video picture of the Defendant at 6:10 p.m. The Defendant wore a dark-colored coat, dark jeans with fading, and black, high-top shoes with his jeans tucked into the shoes. Defense counsel then played a portion of the surveillance video from "just prior" to the shooting. The Defendant wore the same jeans and shoes with the jeans tucked into the shoes; however, the Defendant additionally wore purple gloves and his coat appeared to be "shinier" and bigger than in the surveillance video from earlier in the evening. Detective Frank agreed that the fading on the Defendant's jeans appeared different in the surveillance video clips of the shooting than they did in the surveillance footage from earlier in the evening when the Defendant was inside the Z-Mart. Detective Frank acknowledged the difference but stated that it could be different jeans or the difference in lighting in the locations. Upon viewing more footage of the shooting, Detective Frank agreed that the Defendant wore a different coat at the time of the shooting than he had in the surveillance video footage from around 6:00 p.m.

In the video surveillance footage of the shooting, Detective Frank was unable to determine if the shooter wore something on his head. He agreed, however, that in the surveillance footage from earlier in the evening, the Defendant's dreads are visible, but the dreads are not visible on the shooter during the surveillance footage of the shooting after 8:00 p.m.

10

MNPD SISU Detective Chad Gish testified as an expert in the field of digital forensic technology. Detective Gish and Detective Moyer reported to the Z-Mart shooting scene and assisted in retrieval of video evidence. His involvement was minimal as Detective Moyer was the "resident expert" in video forensics. Detective Gish became more involved with the case when the Defendant's iPhone 7 and Phillips's iPhone 5S were collected. Detective Gish used forensic software to extract data from both phones and loaded the data into Cellebrite for analysis.

Detective Gish found the phone number associated with Phillips's phone in the Defendant's contacts list. The Defendant's contact in his phone was either created or updated on December 27, 2017, at 4:15 p.m. to the contact name "Mom's" six days after the shooting.

Detective Gish testified about text messages received and sent from the Defendant's phone on December 22, 2017, the day after the shooting. A contact named "Birt" sent a message at 11:40 a.m., "What's up, bro? You able to link up today? Off today?" A little over an hour later, an image was sent from the Defendant's phone to Birt. The image was a link to an article about the shooting. "Birt" responded with a question mark. A message sent from the Defendant's phone at 2:29 p.m., stated, "They looking for me and too much sh*t happened, bro."

Detective Gish testified about a text message exchange between the Defendant's phone and an unknown entity in the morning on the day of the shooting. At 8:27 a.m. on December 21, 2017, a message is sent from the Defendant's phone "You gonna have that revolver tonight [o]r Glock." The response and the unknown number was "Yes, what time[?]" A message from the Defendant's phone stated, "He gone get rid of a Glock[?]" The response was "No." The following exchange occurred between the unknown number and the Defendant's phone as follows:

| | |
|---|---|
| "Mom's": | Okay, damn. lol…can u take hunnid for the .38? [11:50 a.m.] |
| Unknown: | Right this minute I can. Can I come to you[?] [12:52 p.m.] |
| "Mom's": | Yeah, that's cool. [12:52 p.m.] |
| Unknown: | wya (where you at?) [12:53 p.m.] |
| "Mom's": | Knollcrest [12:54 p.m.] |
| Unknown: | Omw (on my way) [12:58 p.m.] |
| Unknown: | You still there, right[?] [I]'m in downtown on my way [1:24 p.m.] |
| "Mom's": | Yea [1:24 p.m.] |
| "Mom's": | Ima cum to car [1:33 p.m.] |

11

Unknown:                    Im 10 min out[.]  im trying to get to you [1:34 p.m.]

Detective Gish also recovered from the Defendant's cell phone a photograph of Mr. Lisi's game board.  The photograph was taken on the Defendant's phone on December 21, 2017, at 4:56 p.m.  The phone also contained seven or eight photographs of Phillips.  One photograph of the Defendant and Phillips, taken on September 10, 2017, showed Phillips wearing shoes consistent with what was worn in the surveillance video footage.

Phillips's contact in the Defendant's phone was "DBO" or "Debo."  A phone call was placed from the Defendant's phone on December 28, 2017, to Phillip's phone at 4:55 p.m.  The call was answered and lasted for twenty-nine seconds.

Detective Gish found search terms on the Defendant's phone associated with the Z-Mart shooting before the police issued a press release about the shooting on December 22, 2017, at 8:44 a.m.  The Defendant's phone contained numerous searches for information related to the shooting beginning at 1:31 a.m., on December 22, 2017.  The search term used was "shooting at the Z-Mart."  At 2:00 a.m. and again at 9:32 a.m., the Defendant's phone showed searches on Nashville Tennessee news.  The forensic analysis of the Defendant's phone showed the following search terms used throughout the day on December 22, 2017: "gunpowder residue on hands," and "Shooting at the Z-Mart, Nashville, Tennessee."  On December 23, 2017, the phone contained searches for "Z-Mart shooting," "Z-Mart, Nashville, Tennessee, shooting," "homicide laws in Nashville, Tennessee," "Z-Mart," and "person of interest, Nashville, Tennessee."  Twice on December 24, 2017, the phone ran a search for, "can the law hold you if you are a person of interest."  More crime-related searches were reflected in the phone's history on December 29, 2017.

Detective Gish testified that the Defendant's phone also indicated that various websites were accessed based upon the search results.  For example, for the search term "gunshot residue" – the user accessed the gsr.org website.  Articles from the Tennessean about Z-Mart shooting were accessed as well as information about the shooting issued on Twitter, News 2, and News Channel 5.

Detective Gish also recovered a text message exchange indicating the Defendant's intention of flight.  An unknown phone number sent a message on December 24, 2017, at 11:09 p.m., to the Defendant's phone.  The message was "I don't mean to keep leaving like that, just gotta handle this business.  I'm gone make sure I at least get to spend one night with you before you leave."  A subsequent message was sent, "hough…I'm gone miss you thug."  A response sent from the Defendant's phone at 11:18 p.m., read, "U good[.] do yo thing and that's cool[.] I ain't left yet lol don't jinx me[.]"

12

After hearing the evidence, the jury convicted the Defendant of first degree premeditated murder, felony murder, attempted first degree premeditated murder, and aggravated assault. The trial court merged the first degree premeditated murder and the felony murder and imposed a life sentence. The trial court imposed a twenty-five-year sentences for the attempted first degree murder conviction and a six-year sentence for the aggravated assault conviction. The trial court ordered the sentences to be run consecutively to each other. It is from these judgments that the Defendant appeals.

## II. Analysis

The Defendant challenges the sufficiency of the convicting evidence. Specifically, he challenges the sufficiency of the evidence establishing his identity as to all his convictions. The State responds that the record provides "overwhelming support for the jury's" decision to convict the Defendant on all charges. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn.

13

1997).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant argues that the proof is insufficient to prove his identity as to all counts.  "The identity of the perpetrator is an essential element of any crime."  *Rice*, 184 S.W.3d at 662 (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)).  The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt.  *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998).  The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two.  *Thompson*, 519 S.W.2d at 793.  "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made."  *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87–88 (Tenn. Crim. App. 1993)).  The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof.  *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (citing *Strickland*, 885 S.W.2d at 87).  In addition, as relevant here, this court has held that "the testimony of a victim, by itself, is sufficient to support a conviction."  *Strickland*, 885 S.W.2d at 87 (citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. First degree murder includes a "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2) (2018). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2018).

Aggravated assault is defined in Tennessee Code Annotated section 39-13-102 (2018) defines aggravated assault as when a person "intentionally or knowingly commits and assault as defined in § 39-13-101," and the assault "[i]nvolved the use or display of a deadly weapon." Assault, as defined in section 39-13-101, is when a person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury."

The evidence, viewed in the light most favorable to the State, showed that at around 6:00 p.m. the Defendant played a "chance game" multiple times and lost money. Frustrated over the loss of his money, the Defendant, armed with a gun, later returned to the gas station parking lot with Phillips, who was also armed with a gun provided by the Defendant. The Defendant approached Mr. Foxx's car and shot through the back window of the car at Mr. Foxx who was seated in the driver's seat. The Defendant shot Mr. Foxx in the back of the head. As Mr. Foxx exited the car, he recognized the Defendant's build and apparel from earlier in the evening when the Defendant had been playing the "chance game". Mr. Foxx returned fire at the Defendant, who fled up a hill next to Mr. Foxx's car toward the Sunrise Market. Co-defendant Phillips was at the top of the hill, between the two convenience stores, shielded by a storage container. He fired the gun the Defendant gave him multiple times at the game trailer where Ms. Manning and Mr. Lisi were located. Terrified, both Ms. Manning and Mr. Lisi fled from the trailer. Ms. Manning hid behind Mr. Lisi's SUV on the passenger side away from where the defendants were shooting, and Mr. Lisi moved to the passenger side of the truck where he sustained two gunshot wounds. When police arrived, the defendants fled across Clarksville Highway to Phillips's car. Mr. Lisi and Mr. Foxx were transported to the hospital for treatment; however, Mr. Lisi died due to his injuries. This is sufficient evidence upon which a jury could convict the Defendant of first degree premeditated murder, felony murder, attempted first degree premeditated murder, and aggravated assault.

The Defendant's sole complaint on appeal is with respect to identity. We acknowledge that the identity of a perpetrator is an essential element of any crime. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Issues regarding identity, however, are questions of fact to be determined by the jury. *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn.

15

Crim. App. 1998). Any conflicts in witness testimony regarding the identity of the accused and the weight to be afforded the testimony are resolved by the jury. *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994).

Here, the two victims who survived the shooting identified the Defendant at trial. Mr. Foxx and Ms. Manning were near the Defendant while he played the "chance game" multiple times earlier in the evening, allowing them to see the Defendant's face and identify him. This testimony, alone, is sufficient to sustain the convictions. *See Strickland*, 885 S.W.2d at 87. Moreover, the State presented surveillance video footage from earlier in the evening of the Defendant inside the Z-Mart and at the gaming trailer for comparison with the surveillance footage of the shooters during the incident. Phillips also identified the Defendant and himself as the shooters, recounting the events leading up to the shooting. Finally, police detectives presented evidence of cell phone communication indicating the Defendant bought a gun earlier on the day of the shooting and a plan to leave the area following the shooting. The Defendant's cell phone also contained numerous searches related to the shooting. The jury resolved any inconsistencies or credibility issues with their verdict, and we will not reweigh or reevaluate the evidence. *See Campbell*, 245 S.W.3d at 335; *Dorantes*, 331 S.W.3d at 379. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing authorities and analysis, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

16